**Affirmed and Opinion filed August 6, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00102-CR

**TYLER CHRISTIAN GREEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 248th District Court
Harris County, Texas
Trial Court Cause No. 1541800**

## OPINION

A jury found appellant guilty of murder and assessed punishment at fifty years' confinement. In three issues, appellant contends that (1) the trial court erred by excluding communicated character evidence during the guilt-innocence phase of the trial, (2) the evidence is insufficient to support his conviction, and (3) the trial court erred by admitting evidence of appellant's extraneous offenses during the punishment phase. We affirm.

# I.  SUFFICIENCY OF THE EVIDENCE

We first address appellant's second issue concerning the sufficiency of the evidence. *See, e.g.*, *Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Appellant contends that the evidence is insufficient because the jury's rejection of his claim of self-defense is not supported by the evidence.

## A.  Legal Principles

In a sufficiency review, we consider all of the evidence in the light most favorable to the jury's verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Balderas v. State*, 517 S.W.3d 756, 765–66 (Tex. Crim. App. 2016). We defer to the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* at 766. The jury is the sole judge of the credibility and weight to be attached to witness testimony, and we must defer to the jury's resolution of conflicting inferences that are supported by the record. *See id.*

An actor is justified in using deadly force if, among other things, the actor reasonably believes deadly force is immediately necessary to protect the actor against another's use or attempted use of unlawful deadly force. *See Morales v. State*, 357 S.W.3d 1, 4 (Tex. Crim. App. 2011) (citing Tex. Penal Code § 9.32(a)(2)(A)). A defendant has the initial burden to bring forth evidence in support of a claim of self-defense. *See Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)). Once this burden is met, the State must disprove the defense beyond a reasonable doubt. *Hernandez v. State*, 309 S.W.3d

661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Zuliani*, 97 S.W.3d at 594). A jury's verdict of guilty is an implicit finding rejecting the defendant's self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Accordingly, when an appellant challenges the sufficiency of the evidence to support the jury's rejection of self-defense, we must determine whether any rational trier of fact could have found beyond a reasonable doubt (1) the essential elements of the alleged offense, and (2) against appellant on the self-defense issue. *See Dearborn*, 420 S.W.3d at 372. "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914.

## B. The Evidence

Appellant testified and admitted to shooting the unarmed decedent during a drug deal. The decedent had been selling appellant pills to satisfy appellant's drug habit. Initially, appellant saw the decedent every day and would also give the decedent rides about three times per week. Appellant claimed to have witnessed the decedent becoming angry and aggressive towards people who owed him money. On one occasion, the decedent showed appellant that the decedent carried a gun on his ankle.

According to appellant, their relationship deteriorated after the decedent sold appellant a car, and the decedent's car had to be put in "the shop," leaving the decedent without a car. The decedent wanted appellant to give the decedent rides again or pay the decedent more money for the car. Appellant refused. The decedent said threatening things to appellant over the phone and showed up at appellant's

apartment. At the apartment, the decedent told appellant that "bad things" might happen to appellant or his family if appellant did not give the decedent his car back.

Appellant was not buying pills as often, and he bought some pills from another dealer on the usual day that appellant would buy from the decedent. The decedent called appellant and was upset about the car and that appellant had not bought pills from the decedent. A few days later, when appellant could not buy pills from any other dealers he knew, he called the decedent to set a meeting to buy pills. They planned to meet in the parking lot of a strip mall.

At the time, appellant had been living with his girlfriend. She kept a .38 revolver and about ten bullets in her nightstand. Without telling his girlfriend, appellant took the gun, loaded it, and brought it with him. He wore a fedora and a trench coat, although it was a warm February day.

Appellant arrived at the strip mall before the decedent and went inside a Jumpalooza—a "kids' playland" with "bouncy houses." He asked employees about pricing and for a flier. Appellant also went into a restaurant and asked an employee if appellant could use the restroom. He was captured on surveillance videos. Several witnesses noted appellant's odd clothing choice for a warm day.

The decedent called appellant when the decedent arrived, and appellant got into the decedent's car. A family leaving the Jumpalooza was getting into their own car nearby. The father of that family testified that they crossed paths with a man in a trench coat, and the man was inside the decedent's car for five to ten seconds before the father heard the gunshots. The father saw the decedent slump to the middle of the car, and the man pushed the decedent towards the driver's side door. When the man got out of the car, the man fired additional shots at the decedent before getting in his own car and leaving.

4

Another witness who was inside a nail salon testified that she saw a man in a trench coat get into the decedent's car, but the man stayed in the vehicle for one to two minutes before the witness heard a loud banging sound. She did not see the man fire shots into the car from the outside.

Appellant testified that when he got into the decedent's car, the decedent was being aggressive and agitated. The decedent told appellant, "I'm going to mess you up, I'm going to get my F-ing money." After one to two minutes, the decedent said, "I should F-ing kill you. I'm going to F you up." Appellant testified that the decedent started to reach down by his feet, and appellant thought the decedent was going for a weapon to kill appellant. Appellant shot the decedent five times with the revolver. Appellant testified that he did not "give [the decedent] enough time to see what he was reaching for." Appellant denied touching the decedent, firing any shots while outside the car, or stealing anything from the car.

A medical examiner testified that several bullets entered the side of the decedent, but several bullets also entered the decedent's back at a downward trajectory. The wounds to the decedent's back included soot, which indicated to the medical examiner that the gun was pressed up against the decedent's body or within an inch of his body. Police officers did not find a gun at the scene.

After the shooting, appellant called and texted the decedent multiple times. He admitted that he tried to "make it look like [he] wasn't there." But he did not think about the existence of cell site location data at the time he made the communications. After driving away, he threw the shell casings out of his car window. He threw away his trench coat at a gas station. When he got home, he hid the clothes he was wearing and returned the gun to the girlfriend's nightstand. When his girlfriend discovered that she was missing bullets, he told her that her son had been going through her drawers, so he hid the bullets elsewhere. He did

5

not turn himself in to the police. Although he claimed to have spoken with an attorney, he did not tell anyone else what had happened. When he became a suspect and people started asking him about what happened, he told them he was not involved. Appellant spoke with his mother often after the shooting, but he never mentioned self-defense.

## C.  Analysis

Appellant's defensive evidence is merely consistent with the physical evidence at the scene of the offense, and thus, cannot render the State's evidence insufficient because the credibility determination regarding his evidence is solely within the jury's province, and the jury is free to accept or reject the defensive evidence. *See Saxton*, 804 S.W.2d at 914. Appellant has not shown how the jury's credibility determinations are irrational in this case, so we cannot disturb the jury's credibility determinations. *See Braughton v. State*, 569 S.W.3d 592, 611 (Tex. Crim. App. 2018).

The jury heard evidence that the decedent had verbally threatened appellant on a prior occasion, and yet appellant voluntarily met with the decedent to buy drugs. The jury heard that appellant brought a loaded gun to this meeting, shot the unarmed decedent within five to ten seconds of entering the car, shot the decedent in the side and back at close contact, manipulated the decedent's body, fired shots into the car after getting out, disposed evidence of the crime, attempted to fabricate exculpatory evidence, and lied to his girlfriend and others in an attempt to cover up his participation. Furthermore, appellant testified that he fired the gun before he could see what the decedent was reaching for.

A rational jury could have found beyond a reasonable doubt that appellant did not reasonably believe deadly force was immediately necessary to protect appellant against the decedent's use or attempted use of unlawful deadly force. *See*

6

*Braughton*, 569 S.W.3d at 611 (sufficient evidence to reject self-defense despite defendant's and his parents' testimony that the decedent made a verbal threat to use a gun while reaching into the saddlebags of a motorcycle, and uncontroverted evidence that the decedent had just assaulted the defendant's father and knocked him to the ground); *Mendez v. State*, 515 S.W.3d 915, 919, 921–22 (Tex. App.—Houston [1st Dist.] 2017) (sufficient evidence to reject self-defense despite evidence that the decedent had said he wanted to harm someone, the defendant and decedent had a verbal altercation, the decedent fired a gun near a nightclub on a prior occasion, and the decedent had a reputation for violence; noting evidence that the defendant hit the decedent first and then later threw away his bloody clothes and the murder weapon and inquired about destroying surveillance tapes), *aff'd*, 545 S.W.3d 548 (Tex. Crim. App. 2018); *see also Granger v. State*, 3 S.W.3d 36, 39 (Tex. Crim. App. 1999) (noting that the reasonableness of a defendant's belief that deadly force was necessary is ordinarily a question of fact for the jury).

Appellant's second issue is overruled.

## II.    ADMISSION OF EVIDENCE

In his first issue, appellant contends that the trial court erred by excluding "communicated character" evidence, i.e., the decedent's bad acts known by appellant. In particular, appellant contends that the trial court excluded evidence that (1) the decedent had committed home burglaries during which he stole firearms; (2) the decedent had verbally threatened harm to appellant and his loved ones some time before the shooting; (3) the decedent had been in previous physical altercations; and (4) the decedent had numerous tattoos that suggested affiliation with or membership in a violent criminal street gang.

7

## A.    Legal Principles

We review a trial court's decision to exclude evidence for an abuse of discretion. *See Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). Under this standard, we may not reverse a judgment unless we believe that the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree. *Id.*

Although relevant, character evidence is generally inadmissible. *Sims v. State*, 273 S.W.3d 291, 294 (Tex. Crim. App. 2008). Evidence of a person's character is not admissible to prove that a person acted in accordance with the character, and evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that the person acted in accordance with the character. Tex. R. Evid. 404(a)(1), (b)(1). Even when character evidence is admissible, usually this evidence may be proven only through opinion or reputation evidence and not through specific instances of conduct. *See* Tex. R. Evid. 405; *Sims*, 273 S.W.3d at 294.

However, in a case such as this one in which the defendant adduces evidence of self-defense, the defendant may offer evidence of the victim's reputation, opinion testimony, and evidence of specific prior acts of violence by the victim to show the reasonableness of the defendant's claim of apprehension of danger from the victim. *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009). "This is called 'communicated character' because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not." *Id.* (citing *Mozon v. State*, 991 S.W.2d 841, 846 (Tex. Crim. App. 1999)). For example, when the decedent in a homicide case was unarmed, the defendant's claim of self-defense rests on a perceived danger, which is "frequently based on a furtive gesture that can only be regarded as a threat when

it is considered in light of the decedent's reputation for violence." *Fry v. State*, 915 S.W.2d 554, 560 (Tex. App.—Houston [14th Dist.] 1995, no pet.), *cited in Ex parte Miller*, 330 S.W.3d at 618 n.16.

In short, communicated character evidence in the form of the victim's specific acts of violence is admissible under Rule 404 to show the defendant's state of mind. *Mozon*, 991 S.W.2d at 846; *see* Tex. R. Evid. 404(b)(2). But even if communicated character evidence is admissible under Rule 404, the trial court may still exclude the evidence under Rule 403. *See Mozon*, 991 S.W.2d at 846. And even if the trial court has erred by excluding evidence, generally we may not reverse a conviction unless the erroneous exclusion of evidence was harmful, i.e., affected the party's substantial rights. *See* Tex. R. Evid. 103(a); Tex. R. App. P. 44.2(b); *Walters v. State*, 247 S.W.3d 204, 218–19 (Tex. Crim. App. 2007).

## B.    Burglaries

At trial, appellant's counsel proffered evidence that the decedent had told appellant that the decedent had broken into peoples' houses and taken some guns. The trial court, agreeing with the State's argument, ruled that evidence of the decedent's burglaries was not admissible because it was "more prejudicial than probative."

Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403. The rule authorizes a trial court to exclude relevant evidence only when there is a clear disparity between the degree of prejudice of the evidence and its probative value. *Mozon*, 991 S.W.2d 847. A reviewing court, however, should reverse the trial court's ruling rarely and only after a clear abuse of discretion. *Id.*

The criteria for determining whether the prejudice of an extraneous offense substantially outweighs its probative value include:

> (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;
>
> (2) the potential the other offense evidence has to impress the jury in some irrational but nevertheless indelible way;
>
> (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense;
>
> (4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Id.* (quotations and citations omitted).

Little time would have been necessary to show that appellant believed that the decedent participated in burglaries based on the decedent's alleged admission of that fact, so the third factor favors admission of the evidence. The remaining factors, however, favor the trial court's decision to exclude the evidence. Evidence of extraneous offenses is inherently prejudicial and tends to confuse the issues. *See Sims*, 273 S.W.3d at 295. Evidence that appellant believed the decedent participated in burglaries and stole guns would not have been compelling evidence of appellant's state of mind, and appellant had little need for the evidence. The nature of the extraneous offenses—burglaries—do not significantly bear on issue of apprehension of danger in this case involving the falling out between a drug dealer and his customer over the purchase of a car. *Cf. Thompson v. State*, 659 S.W.2d 649, 654 (Tex. Crim. App. 1983) (under pre-Rules common law, evidence of the decedent's convictions for unlawfully carrying weapons were not probative

of the reasonableness of the defendant's apprehension of danger because she did not testify that she thought the decedent was armed or might use a weapon against her).

For example, appellant did not proffer any evidence that he believed the burglaries involved acts of violence. And, the trial court admitted other, much more probative, evidence related to appellant's state of mind, including evidence that (1) appellant knew the decedent to be violent and aggressive toward customers who owed the decedent money, (2) the decedent had made threats against appellant and had been aggressive toward appellant, (3) the decedent had a reputation for violence, (4) the decedent carried a gun on his person, (5) the decedent was a drug dealer and user, and (6) the decedent told appellant, "I should F-ing kill you. I'm going to F you up."

The trial court did not abuse its discretion by excluding the evidence of appellant's belief that the decedent had broken into houses and taken guns.

## C.     Verbal Threat, Gang Membership, Fights

We assume without deciding that the trial court erred by excluding the remainder of the evidence and that appellant preserved error, but we hold that the alleged errors were harmless.

### 1.  Excluded Evidence

Appellant made the following offer of proof for excluded evidence related to a statement that the trial court ruled was hearsay:

> The testimony we would have elicited is the excited utterances during the confrontation outside of the apartment were [sic] several statements by [the decedent] of "nobody stands behind me and my fucking money. I want my fucking money. I should fucking kill you. You're going to be sorry if I don't get my fucking money. Remember,

11

I know where you live, and I know where you and [the girlfriend] live."

Also, appellant sought to introduce evidence that he knew the decedent to be a member of a gang:

> I anticipate that my client will testify that he had spent a significant amount of time with [the decedent], that he had seen his tattoos, that based on his experience buying from drug dealers and being on the streets that he knew some of those tattoos were Blood gang tattoos, that [the decedent] admitted to him that he was a member of the Vice Lords Gang and he knows Bloods to be a violent street gang and which is one of things that affected his state of mind as far as his fear of the complainant.

The trial court ruled that the evidence was inadmissible because it was "more prejudicial than probative."

Finally, appellant sought to introduce evidence that the decedent had told appellant that the decedent "had gotten in fights with people in the past." The trial court ruled the evidence was irrelevant or inadmissible under Rule 403.

### 2. Constitutional vs. Non-Constitutional Error

The analysis of whether the alleged errors were harmful is different depending upon whether the errors are constitutional or not. *See* Tex. R. App. P. 44.2; *Mercier v. State*, 322 S.W.3d 258, 261 (Tex. Crim. App. 2010). Appellant contends that the exclusion of this evidence amounts to constitutional error.

Generally, errors in sustaining the State's objections to the admission of a defendant's evidence are non-constitutional. *Easley v. State*, 424 S.W.3d 535, 540 (Tex. Crim. App. 2014). Such errors are only considered constitutional errors if the excluded evidence formed a vital portion of the defendant's case. *Id.* Evidence forms a vital portion of a defendant's case if the exclusion effectively prevents the defendant from presenting a defense. *See id.*

12

Here, the trial court allowed substantial evidence relating to appellant's theory of self-defense. The jury heard about the decedent's violent reputation and interactions with customers, animosity toward appellant, threats made toward appellant, and carrying a firearm, and that appellant feared for his life and displayed some behavior that was inconsistent with a person planning to murder his drug dealer. Appellant was not effectively prevented from presenting his defensive theory, and the excluded evidence would have incrementally furthered the defensive theory. *Cf. Walters v. State*, 247 S.W.3d 204, 221–22 (Tex. Crim. App. 2007) (holding that the exclusion of the defendant's statement supportive of his self-defense theory was non-constitutional error because the defendant fully presented his self-defense theory when he testified); *Portier v. State*, 68 S.W.3d 657, 665–66 (Tex. Crim. App. 2002) (holding that the exclusion of statements made to the defendant, which were probative of self-defense, was non-constitutional error because the defendant was not prevented from presenting a defense).

The alleged errors are non-constitutional.

### 3. *No Harm*

Non-constitutional errors that do not affect the defendant's substantial rights must be disregarded. *See* Tex. R. Evid. 103(a); Tex. R. App. P. 44.2(b); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). A substantial right is affected, i.e., the error is harmful, if the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Morales*, 32 S.W.3d at 867. The error is harmless, however, if we have a fair assurance that the error did not influence the jury or had but a slight effect. *See id.* In making this determination, we must consider the entire record, including the admitted evidence, the nature of the evidence supporting the verdict, the character of the alleged error, and how the

13

error might be considered in connection with other evidence. *Id.* We may consider the jury instructions, the parties' theories of the case, closing arguments, and voir dire. *Id.*

Although the trial court prevented appellant from stating the exact words of the threat made some time before the homicide, appellant testified without objection about the threat:

> Q. Did he tell you bad things that might happen to you or your family if you didn't give him his car back?
> A. Yes.

Appellant testified that the decedent was screaming and yelling and being aggressive. Appellant testified that the decedent "threatened" appellant on other occasions, and told appellant at the time of the homicide, "I'm going to mess you up, I'm going to get my F-ing money. . . . I should F-ing kill you. I'm going to F you up."

Accordingly, the jury heard plenty of other evidence concerning the decedent's threats and animosity toward appellant. The exact words spoken by the decedent on some day before the homicide were cumulative of other evidence of the decedent's threats. *See Jefferson v. State*, 900 S.W.2d 97, 102 (Tex. App.—Houston [14th Dist.] 1995, no pet.) (harmless error to exclude police report when the officers testified about contents); *Vega v. State*, 898 S.W.2d 359, 363 (Tex. App.—San Antonio 1995, pet. ref'd) (harmless error to exclude evidence of "bad blood" between the decedent's gang and the defendant's gang because the record was replete with testimony concerning the ill-feelings between the two and their gangs); *see also Smith v. State*, 355 S.W.3d 138, 151–52 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (harmless error to exclude evidence that the decedent stabbed a third party on a prior occasion because there was other direct evidence,

through defendant's and other witnesses' testimony, that the decedent was the first aggressor).

Regarding tattoos, the jury saw pictures of the decedent's many tattoos. Appellant testified about the various tattoos, including one with a "gangster rosta guy" with a quote about "smoking like a rosta living like a mobsta." One tattoo included a "Tommy gun." Appellant testified that the decedent's tattoos made appellant think that the decedent was violent or aggressive. Appellant testified, "Obviously in my opinion if you have guns tattooed all over you, there's a reason behind all of that."

Thus, appellant was not prevented from describing the decedent's tattoos, including those of guns and a "gangster," and explaining how those tattoos caused appellant to view the decedent as violent and aggressive. The excluded evidence was that appellant believed the decedent to be a member of a gang, which affected appellant's fear of the decedent. But there is plenty of other evidence in the record that appellant was afraid of the decedent. Appellant brought a loaded gun to the drug deal—something he had never done before—because he was "real nervous about how the meeting would go." Appellant testified about the growing animosity and aggressive behavior the decedent was directing toward appellant. And, there is no evidence in the record to indicate that the decedent's membership in a gang played any role in the confrontation between appellant and the decedent. *Cf. Allen v. State*, 473 S.W.3d 426, 448–49 (Tex. App.—Houston [14th Dist.] 2011) (no error to exclude evidence of the defendant's knowledge of the decedent's membership in a gang in part because the altercation was not asserted to be gang-related), *pet. dism'd*, 517 S.W.3d 111 (per curiam). Finally, we note that appellant's mother testified that the decedent was a "known gang member."

Evidence that appellant knew the decedent "had gotten in fights with people in the past" would not have influenced the jury's verdict regarding the reasonableness of appellant's apprehension of danger in light of the other significant evidence that appellant was able to present in support of his theory of self-defense. In particular, the jury heard that the decedent had a violent reputation for drug dealing, appellant believed the decedent to be a violent person, appellant witnessed the decedent's aggressive interactions with customers, the decedent displayed animosity toward appellant, the decedent threatened appellant and his family, the decedent carried a firearm, appellant was so nervous that he carried a gun to a drug deal for the first time in his life, the decedent made specific threats to kill and "F [appellant] up," and appellant was "terrified" at the time of the shooting. Moreover, appellant's proffer did not indicate that the decedent had used deadly force in the prior fights. Thus, the evidence would have had little influence on the issue of whether appellant reasonably believed that deadly force was immediately necessary to protect himself from the decedent's use or attempted use of unlawful deadly force.

Considering the entire record, we have a fair assurance that the trial court's alleged errors of excluding some evidence of the decedent's earlier threat against appellant, gang membership, and physical altercations did not influence the jury or had but a slight effect.

Appellant's first issue is overruled.

### III. ADMISSION OF EVIDENCE

In his third issue, appellant contends that the trial court erred during the punishment phase by admitting extraneous-offense evidence that had not been adequately noticed. Specifically, appellant complains about the admission of (1) insufficiently noticed statements by appellant showing racial prejudice; (2) an

"unnoticed" statement by appellant that he desired to kill someone, (3) an "improperly noticed" robbery, and (4) an "unnoticed" robbery.

## A. Legal Principles

We review a trial court's decision to admit evidence, like a decision to exclude evidence, for an abuse of discretion. *See Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016).

During the punishment phase of a trial, evidence is admissible if the trial court deems it relevant to sentencing, "including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant." Tex. Code Crim. Proc. art. 37.07, § 3(a)(1). "On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence." *Id.* art. 37.07, § 3(g).[1] Furthermore:

> If the attorney representing the state intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act. The requirement under this subsection that the attorney representing the state give notice applies only if the defendant makes a timely request to the attorney representing the state for the notice.

[1] Rule 404 provides that evidence of a crime, wrong, or other act may be admissible for a purpose other than to show a person acted in accordance with their character on a particular occasion, but: "On timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce such evidence—other than that arising in the same transaction—in its case-in-chief." Tex. R. Evid. 404(b)(2).

*Id.*

The purpose of the notice requirement is to avoid unfair surprise and trial by ambush, *Brooks v. State*, 76 S.W.3d 426, 435 (Tex. App.—Houston [14th Dist.] 2002, no pet.), and to enable the defendant to prepare to meet the extraneous-offense evidence. *Roethel v. State*, 80 S.W.3d 276, 282 (Tex. App.—Austin 2002, no pet.) (assessing harm, considering whether the defendant was surprised by the substance of the testimony and whether the surprise affected his ability to prepare cross-examination or mitigating evidence), *cited in Hernandez v. State*, 176 S.W.3d 821, 824–25 (Tex. Crim. App. 2005). Generally, a trial court errs by admitting evidence of an extraneous offense when the State has not complied with the notice requirement of Article 37.07. *See Crain v. State*, 373 S.W.3d 811, 815 n.5 (Tex. App.—Houston [14th Dist.] pet. ref'd) (citing *Roethel*, 80 S.W.3d at 281); *see also Hernandez*, 176 S.W.3d at 824–25 (analogizing to *Roethel* when the State did not provide adequate notice of extraneous offenses under Rule 404 of the Texas Rules of Evidence).

## B.    Background

Before trial, appellant requested notice under Article 37.07.[2] The State filed a notice of extraneous offenses and listed the following, among others:

- The State plans to introduce testimony/evidence through witness Chelsea Murphy that the Defendant, Tyler Green, committed the offense of Aggravated Robbery with a Deadly Weapon on or about 2014.

- The State plans to introduce testimony/evidence that the Defendant has a racial prejudice against African Americans, including but not

---

[2] Specifically, appellant requested: "Pursuant to Texas Code of Criminal Procedure 37.07 § 3(g), the Defense hereby requests that the State provide notice of all evidence of extraneous crimes and bad acts that it intends to introduce at the sentencing phase of the Defendant's trial."

limited to evidence of the Defendant's derogatory language toward and about African Americans.

At the beginning of the punishment phase, appellant made the following argument concerning the aggravated robbery:

> Your Honor, I think that the notice is deficient because it does not provide a complainant's name, it says aggravated robbery but we don't have a manner and means whether this a firearm or anything else. It has no location, whether this is in Texas, in Mississippi or anything else.
>
> I did briefly speak with Miss Murphy a couple of days ago. I believe that she anticipates testifying that this also took place in 2010 instead of the notice which says 2014. So, for those reasons I believe the notice is insufficient on the aggravated robbery.

The trial court ruled that the notice of the aggravated robbery was reasonable and the evidence would be admissible.

Appellant also made several arguments about racial comments recorded in jail phone calls, including that he had "not been told exactly what is on the phone calls that is the extraneous that [the State] intends to prove." The court ruled that the jail phone recordings were admissible.

During the punishment phase, appellant's estranged wife Chelsea Murphy testified about a robbery that occurred in 2010 and then about another robbery:

> Q. And why do you think it was a robbery?
> A. Because we'd actually robbed the same people the day before.
> Q. Okay. So you thought—
> DEFENSE: Objection, Your Honor, lack of notice.
> THE COURT: Overruled.

Additionally, she testified about a statement appellant once made:

Q. And give us more about that twisted mind. Is there anything he said that makes you feel that way?

A. Yeah. He's told me—I don't know when it was, I think it was—I don't know but, yeah, once he told me that if he—if there was anything he could do in this world it would be to kill a man and watch the life drain from his eyes.

Appellant objected, "I've never gotten any notice of any of these statements or any of this testimony." The trial court overruled the objection, stating that the statement was not "an extraneous that has to be given notice of."

Finally, the trial court admitted exhibits consisting of the jail phone recordings. The State played some excerpts and questioned a witness about the calls, but the State did not elicit any testimony about statements showing a racial prejudice.

## C. Waiver Regarding Racial Prejudice

Appellant does not refer to any particular statements of racial prejudice in his brief. No such statements are transcribed in the Reporter's Record. The exhibits include nineteen recordings totaling over five hours in length, and appellant does not direct this court to any particular recording or timestamp.

An appellant must cite to the record, and a failure to do so may result in waiver of error on appeal. *Miles v. State*, 468 S.W.3d 719, 727 (Tex. App.—Houston [14th Dist.] 2015), *aff'd*, 506 S.W.3d 485 (Tex. Crim. App. 2016); *see also Belle v. State*, 543 S.W.3d 871, 875–76 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (issues waived when the appellant failed to refer to the pertinent parts of the record). Although we construe briefs liberally and expect only substantial compliance, the briefs should acquaint the appellate court with the issues in a case and present argument that will enable the court to decide the case. *Miles*, 468 S.W.3d at 727; *see* Tex. R. App. P. 38.9.

20

Without appellant citing to the allegedly inadmissible evidence, we are unable to decide the case. We cannot determine what statements of racial prejudice were admitted, if any, and whether the trial court erred. Appellant has waived any error regarding the admission of racially prejudiced statements.

## D.    Defendant's Statements Not Extraneous Offenses

Appellant contends that his statement about wanting to kill someone was an "extraneous offense" and thus required notice under Article 37.07. An extraneous offense is a crime or other bad act. *See Moreno v. State*, 858 S.W.2d 453, 462–63 (Tex. Crim. App. 1993). There must be "conduct" by the defendant that forms part of the extraneous offense. *Id.* An inchoate thought is not conduct, and thus, not an extraneous offense. *See id.* For example, a defendant's "statements concerning his desire to kidnap and kill" someone was not an extraneous offense for purposes of Rule 404 of the Texas Rules of Evidence. *Id.* Likewise, appellant's statement that he wanted to "kill a man and watch the life drain from his eyes" was not an extraneous offense for purposes of Article 37.07. *Cf. id.*[3]

## E.    No Harm

We assume without deciding that the trial court erred by admitting evidence of the two extraneous robberies because the State's notice was inadequate. But,

---

[3] Appellant does not contend that the notice requirement in Article 37.07 applies to evidence other than extraneous offenses, so we do not address whether notice may be required for other categories of evidence. *Compare Chimney v. State*, 6 S.W.3d 681, 697–98 (Tex. App.—Waco 1999, pet. ref'd) (holding that Article 37.07 requires notice of character evidence), *with Brown v. State*, 54 S.W.3d 930, 932 (Tex. App.—Corpus Christi 2001, pet. ref'd) (holding that Article 37.07 did not require notice because the evidence was not an extraneous offense; declining to apply *Chimney*), *and Hardaway v. State*, 939 S.W.2d 224, 226 (Tex. App.—Amarillo 1997, no pet.) (recognizing that the plain text of Article 37.07's notice requirement "would seem to apply to all evidence," but holding that "it was not the legislative intent to include character evidence within the purview of the section 3(g) notice requirement"). For purposes of this opinion, we assume, as appellant does, that Article 37.07 requires notice only for extraneous offenses.

21

even if we assume that the trial court erred by admitting evidence of the robberies, statements regarding racial prejudice, and appellant's inchoate thought to kill someone, the record does not show harm.

As mentioned above, we must disregard non-constitutional errors unless the error had a substantial and injurious effect or influence in determining the jury's verdict. Tex. R. Evid. 103(a); Tex. R. App. P. 44.2(b); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). In the context of inadequate notice under Article 37.07, we assess harm in light of the statute's purpose to prevent surprise to the defendant. *See Roethel*, 80 S.W.3d at 281–82; *see also Vallery v. State*, No. 14-14-00167-CR, 2015 WL 780093, at *3 (Tex. App.—Houston [14th Dist.] Feb. 24, 2015, no pet.) (mem. op., not designated for publication); *cf. Hernandez*, 176 S.W.3d at 825 (applying *Roethel* harm analysis to inadequate notice under Rule 404). Because extraneous-offense evidence is "substantively admissible," the admission of inadequately noticed evidence is not "'injurious' if the defendant was not surprised by the evidence." *Hernandez*, 176 S.W.3d at 825; *see also Roethel*, 80 S.W.3d at 282 ("The lack of notice does not render the evidence inherently unreliable, but instead raises a question about the effect of procedural noncompliance. . . . Thus, we must analyze how the deficiency of the notice affected appellant's ability to prepare for the evidence.").

Furthermore, our sister court has held that a defendant's failure to request a continuance precludes an appellate court's determination of harm from the admission of inadequately noticed extraneous offenses under Article 37.07. *See Francis v. State*, 445 S.W.3d 307, 319 (Tex. App.—Houston [1st Dist.] 2013), *aff'd*, 428 S.W.3d 850 (Tex. Crim. App. 2014); *see also McDonald v. State*, 179 S.W.3d 571, 578 (Tex. Crim. App. 2005) (reasoning that the defendant did not

suffer harm from a lack of notice under Rule 404 in part because if the defendant had been surprised, he "could have requested a continuance").[4]

Appellant did not request a continuance or explicitly claim to be surprised at trial due to inadequate notice. Neither at trial nor on appeal has appellant explained how, because of the State's failure to give notice, he was unable to prepare a defense in this case. *See Hernandez*, 176 S.W.3d at 826. Moreover, because the State's notice identified the name and subject matter of an extraneous robbery, appellant's trial counsel was able to speak with the witness several days before her testimony. Counsel even discovered facts about the alleged robbery that contradicted the State's notice. Thus, appellant was able to assuage any potential surprise by interviewing the witness before she testified.

Considering the entire record and the trial court's alleged error, in light of the purpose of avoiding surprise to the defendant, we hold that the alleged error did not have a substantial and injurious effect or influence in determining the jury's verdict. The error must be disregarded. *See* Tex. R. App. 44.2(b).

Appellant's third issue is overruled.

## IV. CONCLUSION

Each of appellant's issues is overruled. The trial court's judgment is affirmed.

---

[4] Generally, a defendant's "failure to request a postponement or seek a continuance waives any error urged in an appeal on the basis of surprise." *Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. [Panel Op.] 1982); *see also Bryant v. State*, 35 Tex. Crim. 394, 398 (1896) (noting the "well-settled rule" that a defendant cannot obtain reversal of a conviction by arguing that he was surprised by the testimony of a witness without first asking for "a postponement or continuance of the case so that he can meet the testimony of the witness").

/s/ Ken Wise
Justice

Panel consists of Justices Wise, Zimmerer, and Spain.

Publish — Tex. R. App. P. 47.2(b).